**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**Indianapolis Division**

| | |
|---|---|
| JAMES D. DISHMAN, | ) |
|       *Plaintiff*, | ) |
| | ) |
| v. | ) **Case No.**   1:19-cv-2595 |
| | ) |
| EQUIFAX INFORMATION SERVICES, LLC, | ) |
| TRANS UNION, LLC, | ) |
| KEYBRIDGE MEDICAL REVENUE CARE, | ) |
| and STAR FINANCIAL BANK, | ) |
|       *Defendants*. | ) |

## COMPLAINT WITH JURY TRIAL DEMAND

Plaintiff, James D. Dishman ("Dishman"), by counsel, complains of Defendants, Equifax Information Services, LLC. ("Equifax"), Trans Union, LLC. ("Trans Union"), KeyBridge Medical Revenue Care ("KeyBridge"), and Star Financial Bank ("Star"), as follows:

### Preliminary Statement

1.      This action is based on Defendants' inaccurate and misleading reporting, failure to report certain tradelines or tradeline information as disputed, and failure to conduct reasonable reinvestigations with respect to such information following receipt of a dispute from a consumer.

2.      This action is being brought in part because Dishman is desirous of obtaining credit at rates reflective of his credit risk following the successful completion of a years long Chapter 13 bankruptcy. These rates were not previously available to him and are material to his ability to achieve long term financial success.

### Summary of Applicable Law

3.      Under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.A. § 1681 (West) *et seq.*, consumer reporting agencies are charged with three primary duties: (1) the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports, 15 U.S.C. § 1681e (b); (2) the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information, 15 U.S.C. § 1681i; and, (3) the duty to note a disputed item in the consumer's credit report, 15 U.S.C. § 1681c (f).

4.      A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate or misleading information explicitly includes the duty to notify the providers of the disputed information. This is because the provider of the disputed information stands in a far better position to make a thorough investigation of the disputed information than the credit reporting agency.

5.      The FCRA also imposes duties on said providers of credit information ("Furnishers") to credit reporting agencies. Specifically, the statute requires Furnishers to "conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b)

6.      Then, "[i]f an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified," the Furnisher must "promptly" "modify" or "permanently block the reporting of that piece of information." 15 U.S.C. § 1681s-2(b)

7.      In determining whether a Furnisher violated § 1681s-2(b), courts first ask whether the Furnisher "conduct[ed] a reasonable investigation of their records to determine whether the disputed information can be verified."

8.      Generally, questions regarding the reasonableness of an investigation are best for a jury to determine. *See Meyer v. F.I.A. Card Serv.*, N.A., 780 F. Supp. 2d 879, 883 (D. Minn. 2011).

That said, regardless of an investigation's reasonableness, a Furnisher may be entitled to summary judgment if the consumer fails "to show actual inaccuracies that a furnisher's objectively reasonable investigation would have been able to discover."

9.     The Seventh Circuit has held, "even if [credit] information is technically correct, it may nonetheless be inaccurate if, through omission, it "creates a materially misleading impression." *Johnson v. Trans Union, LLC.,* 524 F. App'x 268, 370 (7th Cir. 2013) ("Johnson must prove that something in his credit report was inaccurate, or at least misleading, to show that the defendants' procedures were unreasonable"); *Seamans v. Temple Univ.,* 744 F.3d 853, 865 (3d Cir. 2014); *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008); *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1186 (10th Cir. 2013); *Gorman v. Wolpoff & Abramson, LLP*, 584 F. 3d 1147, 1157 (9th Cir. 2009); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 616 (6th Cir. 2012).

10.     Furnishers also have a freestanding duty under 15 U.S.C. § 1681s-2 (a) (3) to inform credit reporting agencies that credit information is disputed. As noted above, consumers may not enforce provisions of sub-section (a) directly. However, "the fact that a furnisher is affirmatively obligated to flag an account as disputed under § 1681s-2(a) does not undermine the conclusion that a *failure* to flag the account as disputed also constitutes a material inaccuracy under § 1681s-2(b)." *Seamans*, 744 F. 3d at 867.

11.     In turn, several circuits have built upon the materially misleading standard by holding that a Furnisher may "create a materially misleading impression" when, "having received notice of a consumer's potentially meritorious dispute, [the] furnisher subsequently fails to report that claim as in fact disputed." *Gorman*, 584 F.3d at 1162-64; *Saunders*, 526 F.3d at 149-50. This is

so because "fail[ing] to report a bona fide dispute" "could materially alter how the reported debt is understood."

## Jurisdiction and Venue

12.     Because this case arises under the FCRA, this Court has federal question jurisdiction pursuant to 28 U.S.C.A. § 1331 (West).

13.     This Court has personal jurisdiction over the Defendants because they routinely conduct business in the State of Indiana, including the conduct complained of herein.

14.     Venue is proper in the Southern District of Indiana because a substantial part of the events or omissions giving rise to the claims herein occurred in this district as required by 28 U.S.C.A. § 1391 (West).

## Parties

15.     Dishman is a natural person who resides in Indianapolis, Indiana.

16.     Dishman is an individual and is therefore a "consumer" as that term is defined by 15 U.S.C.A. § 1681a(c) (West).

17.     Dishman is also "consumer" as defined by 15 U.SC. § 1692a(3), and the amounts sought to be collected by KeyBridge are debts as defined by 15 U.S.C. § 1692A(4).

18.     Todd asserts a private right of action under the FDCPA pursuant to 15 U.S.C. §1692k, for Ocwen's willful or deliberately indifferent conduct in connection with collection of the Loan.

19.     KeyBridge is a "debt collector" as defined by 15 U.S.C. § 1692a(6).

20.     Equifax and TransUnion regularly assemble and/or evaluate consumer credit information for the purpose of furnishing consumer reports to third parties, and use interstate

commerce to prepare and/or furnish the reports, and accordingly, are each considered a "consumer reporting agency" as that term is defined by 15 U.S.C.A. § 1681a(f).

21.     KeyBridge regularly and in the ordinary course of business furnished information to one or more consumer reporting agencies about Dishman's transactions and is therefore a "furnisher" as that term is used in 15 U.S.C.A. § 1681s-2 (West).

22.     Star regularly and in the ordinary course of business furnished information to one or more consumer reporting agencies about Dishman's transactions and is therefore a "Furnisher" as that term is used in 15 U.S.C.A. § 1681s-2 (West).

**Factual Allegations Regarding Dishman's Bankruptcy Proceedings.**

23.     On or about June 11, 2012, Dishman filed a Chapter 13 bankruptcy proceeding in the Southern District of Indiana, under Cause No. 12-6904-JJG-13.

24.     Dishman listed KeyBridge, via its predecessors in interest Heart Partners of Indiana, Community Hospital, and/or General Audit Corporation, on his Schedule F.

25.     A true and accurate copy of Dishman's Schedule F is attached hereto as "Exhibit A."

26.     In Schedule D of Dishman's Voluntary Bankruptcy Petition, Star was listed as having a secured claim in the amount of $125,364.69.

27.     A true and accurate copy of the aforementioned Schedule D is attached hereto as "Exhibit B."

28.     On June 13, 2017, Dishman filed his Chapter 13 Plan in accordance with 11 U.S.C. §1322(b) (5), providing for the cure of any then-deficiency and the payment of all future mortgage obligations to Star via the Trustee.

29.     Dishman met all requirements of his Chapter 13 bankruptcy and as a result, he received an Order of Discharge dated September 15, 2017.

30.     A true and accurate copy of the Order of Discharge is attached hereto as "Exhibit C."

31.     Dishman's obligation to KeyBridge, via its predecessors in interest Heart Partners of Indiana, Community Hospital, and/or General Audit Corporation, was discharged as it was an unsecured non-priority obligation.

32.     Dishman's mortgage obligation to Star was not discharged.

33.     Dishman's mortgage obligation to Star was not subject to discharge under 11 U.S.C. § 1328 (a) (1). *See In re Bateman,* 331 F.3d 821, 822 (11th Cir. 2003)(noting that "a secured creditor's claim for mortgage arrearage survives the confirmed [Ch. 13] plan to the extent that it is not satisfied in full by payments under the plan," and that, "because the bankruptcy did not discharge [the Debtor's] personal liability for the [home mortgage] debt, he remained liable for the two payments after bankruptcy." *See*, *also, In re Duke*, 447 B.R. 365 (Bankr. M.D. Ga. 2011).

34.     Accordingly, Dishman has continued to make, and Star has continued to service and accept, monthly payments pursuant to the terms of the mortgage loan.

**Factual Allegations Regarding The CDIA, Metro 2, And Credit Risk Scoring.**

35.     The reporting of consumer credit information, by credit reporting  agencies ("CRAs") and data Furnishers, is the foundation of credit risk scoring and  impacts the financial lives of consumers in innumerable ways, including the  availability and cost of credit, housing opportunities, leasing  prospects, insurance  availability and cost, utility service, and even employment.

36.     In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Consumers can help raise their credit score by

having errors on their credit reports corrected, and consumers seeking to rebuild their credit would be well advised to obtain their credit reports and review them for accuracy.

37.     The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

38.     Because consumer credit reporting information has such far reaching implications for nearly all consumers, the CDIA works together with CRAs to develop, maintain, and enhance industry standard reporting formats and guidelines.

39.     The product of that cooperation is the Metro 2 reporting standards published by the CDIA to assist Furnishers with their compliance requirements under the FCRA. The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

40.     The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

41.     At all times relevant, the Defendants herein adopted, implemented, and sought to adhere to the Metro 2 format as a means of fulfilling its aforementioned duties under the FCRA.

42.     At all times relevant, the CRAs named herein required all entities to whom it grants consumer information reporting rights and access, to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

**Factual Allegations Regarding e-Oscar and Notices of Consumer Disputes**

43.     The FCRA requires CRAs to implement an automated reinvestigation system

through which Furnishers of information to the CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

44.     To comply with those requirements, TransUnion, Equifax, and Experian developed a browser based software system that allows them to electronically notify Furnishers quickly and easily about disputed credit reporting information, and for Furnishers to quickly and easily respond to such disputes following investigation. The system is commonly referred to as e-OSCAR and was designed to be Metro 2 compliant. See, ***https://www.e-oscar.org/implementation/about-us***

45.     The e-Oscar system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing but also various related data reporting processes.

46.     ACDVs are notifications initiated by a CRA, and transmitted to a Furnisher, in response to a consumer dispute, and are the primary method the CRAs  use to fulfill their statutory obligation to notify Furnishers of disputed information of  consumers' disputes.

47.     If a Furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the Furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the Furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

48.     The e-Oscar system facilitates the Furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "carbon copy" of an ACDV response "to each CRA with whom the [Furnisher] has a reporting relationship" in addition to the response to the initiating CRA.

**Factual Allegations Regarding Compliance with Metro 2**

49.    Trans Union, Experian and Equifax have actual knowledge that entities reviewing consumer reports prepared by them reasonably presume they have complied with CDIA guidelines and Metro 2 standards in compiling and reporting the data therein.

50.    Metro 2 requires that all accounts be reported on a monthly basis.

51.    Of particular importance in reporting within the Metro 2 framework standards is the Consumer Information Indicator ("CII"), a single-character code which indicates an account's status in relation to a consumer's bankruptcy.

52.    Furnishers and CRAs are required to update the CII code when a petition for bankruptcy is filed, and again when the bankruptcy is completed or discharged. Here, Metro 2 dictates that Star should be using the CII code "Q".

**Factual Allegations Regarding the Fair Isaac Corporation**

53.    One such entity that regularly reviews consumer reports, and uses the data contained therein is the Fair Isaac Corporation.

54.    The Fair Isaac Corporation uses the data in consumer reports to calculate a consumer's credit score (also known as credit risk scores).

55.    The term credit score is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, Supervision and Examination Manual, Version 2 (October 2012), p 53, available at *http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf*

56.    The Fair Isaac Corporation credit risk scoring system ("FICO") is the leading credit risk scoring system, and utilizes data reported by CRAs and Furnishers which are, ostensibly, in compliance with Metro 2  standards.

57.     FICO scores are calculated from five main categories of credit data in a consumer's credit report.  Those categories, and their weighted values, are as follows:  payment history accounts for 35% of a consumer's FICO score; debt/amounts owed  accounts for 30% of a consumer's FICO score; age/length of credit history accounts  for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of  a consumer's FICO score; and, mix of accounts/types of credit accounts for 10% of a  consumer's FICO score.

*See* **www.myfico.com/credit-education/whats-in-your-credit-score/.**

58.     The cost of credit (e.g., interest rates, fees, etc.), the availability of credit,  and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a  lower interest rate, extended financing periods and lower rate auto loans, and even  zero-percent financing credit offers for in-store credit lines, are all, by and large, driven  by a consumer's FICO score.

59.     Inaccurate or incorrect credit reporting often results in a lower FICO score,  and thus higher costs of credit, diminished opportunity, and less purchasing power for  consumers.

**Inaccurate and Materially Misleading Information Reported by Equifax.**

60.     Sometime around October of 2018, Dishman obtained a copy of his consumer credit report as published by Equifax.

61.     The report contained and inaccurate information relevant to KeyBridge and IMC Credit, now published by Equifax. Specifically, the Equifax credit report reflected that Disman's former obligations to KeyBridge were "Unpaid", in collections, and with active balances despite each of the obligations being discharged via the bankruptcy proceedings detailed above.

62.     Further, the KeyBridge tradelines failed to include any indication whatsoever that the debts were even included in aforementioned bankruptcy proceedings.

63.     The report also failed to include any information relative to Dishman's ongoing monthly mortgage payments to Star. However, Star was and continues to furnish this information to Equifax.

64.     By information and belief, Equifax is unlawfully suppressing any information relative to the Star account.

65.     Thus, Equifax's reporting was inaccurate and misleading because it was inconsistent with the Discharge Order and the intent of the parties. *Crump v. Experian Information Solutions*, No. 18 C 2302 (Jan. 7, 2019 N.D. Illinois).

66.     Equifax's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, as discussed above.

67.     While not dispositive, Courts rely on such guidance to determine Furnisher liability. *See e.g. In re Helmes*, 336 B.R. 105, 107 (Bankr. E.D. Va. 2005) (finding that "industry standards require that a debt discharged in bankruptcy be reported to a credit reporting agency with the notation 'Discharged in bankruptcy'" and with zero balance due") *see, also, Nissou-Rabban v. Capital One Bank (USA), N.A.*, 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018).

68.     Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n (a). *See Gillespie v. Equifax Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

69.     Therefore, within a letter dated October 10, 2018, Dishman disputed the inaccurate and misleading information to Equifax and advised Equifax of the specific facts that rendered the reporting inaccurate and misleading.

70.     A true and accurate copy of the dispute letter is attached hereto as "Exhibit D."

71.     Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Star and KeyBridge of Dishman's dispute within five (5) business days of receiving Dishman's dispute, to forward all relevant information therewith, to conduct a reasonable reinvestigation of the disputed information, and to thereafter correct the tradeline.

72.     Upon information and belief, Equifax timely notified KeyBridge and/or Star of Dishman's dispute in accordance with 15 U.S.C.A. § 1681i (West).

73.     In the alternative, Equifax failed to provide KeyBridge and/or Star with notice of Dishman's dispute.

74.     In response, within a document dated November 1, 2018, Equifax advised Dishman that it had researched his dispute and the current status was being reported correctly.

75.     However, the Equifax "reinvestigation report" merely provided a copy of the KeyBridge tradelines as reported that reproduced at some of the errors identified by Dishman in his original dispute letter.  Specifically, the tradeline still failed to indicate that the debts formerly owed to KeyBridge, as collection agent for Health Partners of Indiana, were discharged via Dishman's bankruptcy proceedings, no longer in collections, and no longer with an unpaid balance.

76.     Moreover, Equifax is still not reporting any information relative to Dishman's mortage with Star despite that information being provided to it.

77.     A true and accurate copy of the Equifax reinvestigation report is attached hereto as "Exhibit E."

78.     Dishman provided all necessary information with his dispute letter to Equifax, does have a current Equifax file, and has actively used credit in the past ten years.

79.     Equifax was required to communicate the specifics of Dishman's dispute to KeyBridge.  Likewise, Equifax had an affirmative duty to reasonably reinvestigate the dispute

submitted by Dishman and to accurately report the tradeline information notwithstanding the information it received from KeyBridge.

**Inaccurate, Incomplete, and/or Materially Misleading Information Reported by TransUnion.**

80.     Also in or around October of 2018, Dishman obtained a copy of his credit report as published by Trans Union.

81.     That report contained erroneous information relative to KeyBridge and Star. Specifically, the TransUnion credit report reflected that Disman's former obligations to KeyBridge were "Unpaid", in collections, and with active balances despite each of the obligations being discharged via the bankruptcy proceedings detailed above.

82.     The report also failed to include any information relative to the timely and adequate mortgage payments Dishman continues to make to Star or that the account is open and current; instead suggesting the account was discharged via his bankruptcy proceedings.

83.     However, Star continues to report the positive payment information and balance to TransUnion.

84.     Because Dishman's debt owed to Star was not discharged and is current, while his former debt to KeyBridge was discharged as it was an unsecured debt, the information described above was inaccurate, incomplete, and misleading.

85.     TransUnion's, KeyBridge's, and/or Star's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, which provides guidance for credit reporting and FCRA compliance.

86.     While not dispositive, Courts rely on such guidance to determine Furnisher liability. *See In re Helmes*, 336 B.R. 105, 107 (Bankr. E.D. Va. 2005) (finding that "industry standards require that a debt discharged in bankruptcy be reported to a credit reporting agency with the

notation 'Discharged in bankruptcy' and 'with zero balance due'") *see, also, Nissou-Rabban v. Capital One Bank (USA), N.A.*, 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018).

87.     Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n (a). *See Gillespie v. Equifax Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

88.     Therefore, within a letter dated October 10, 2018, Dishman disputed the inaccurate and misleading information to Trans Union and advised Trans Union of the specific facts that rendered the reporting inaccurate and misleading.

89.     A true and accurate copy of the dispute letter is attached hereto as "Exhibit F."

90.     Pursuant to 15 U.S.C. § 1681i, TransUnion had a duty to notify KeyBridge and Star of Dishman's dispute within five (5) business days, to forward all relevant information or documents therewith, to conduct a reasonable reinvestigation of the dispute information, and to thereafter correct the tradeline.

91.     In response, within a document dated November 19, 2018, TransUnion advised Dishman that it had researched his dispute and provided a revised report that reflected its findings. However, the reinvestigation report simply deleted the entire tradeline representative of the Star mortgage tradeline.

92.     In addition, the TransUnion "reinvestigation report" failed to make any revisions relative to one or more of the KeyBridge tradelines; TransUnion continues to report them as "In Collection", with a past due balance of $177.

93.     A true and accurate copy of the Trans Union's reinvestigation report is attached hereto as "Exhibit G."

94.     Upon information and belief, Trans Union timely notified Star and/or KeyBridge of Dishman's dispute in accordance with 15 U.S.C.A. § 1681i.

95.     In the alternative, Trans Union did not notify KeyBridge and/or Star of Dishman's dispute, did not perform any reinvestigation into the disputes under either "standard" or "expedited" procedures as described by § 1681i(a)(8), but instead just deleted the Star tradeline.

96.     Dishman's dispute was not frivolous or irrelevant.

97.     TransUnion did not inform Dishman that it had determined the dispute to be frivolous or irrelevant.

98.     Trans Union did not identify any additional information required to investigate Dishman's dispute.

99.     Trans Union did not call Dishman regarding the Ocwen tradeline deletion, as required for an "Expedited Dispute Resolution" under § 1681i (a) (8).

100.    Trans Union was required to communicate the specifics of Dishman disputes to KeyBridge and Star. Likewise, Trans Union had an affirmative duty to reasonably reinvestigate the dispute submitted by Dishman and to accurately report the tradeline information notwithstanding the information it received from KeyBridge or Star.

### Trans Union's and Equifax's Willful Conduct in Detail.

101.    Under § 1681i, which mandates the procedures a CRA must follow in cases of disputed accuracy, there are (only) two scenarios under which a CRA *may* legally be allowed to refrain from notifying the Furnisher of disputed information of a consumer's dispute: 1.) if a CRA determines that a consumer's dispute is frivolous or irrelevant; and/or, 2.) if the CRA resolves the dispute under an expedited dispute resolution process.

102.    Neither scenario applies to the Defendants' conduct as complained of herein.

103.    Under § 1681i (a) (3), a CRA *may* be relieved of its duty to notify the Furnisher of the disputed information of the consumer's dispute if the CRA determines that a consumer's dispute is frivolous or irrelevant.

104.    However, because § 1681i(a)(2) requires that a CRA notify a Furnisher of disputed information within five (5) days of receiving a consumer's dispute, the CRA must make the determination that the dispute is frivolous or irrelevant before the five ( 5 ) days is up.

105.    In the event, a CRA determines that a consumer's dispute is frivolous or irrelevant, § 1681i (a) (3) requires the CRA to notify the consumer of the CRA's determination. That notice must: be given within five (5) days of the CRA's determination; be in writing, or by other means authorized by consumer; state the reason(s) the CRA determined the dispute was frivolous or irrelevant; and, identify any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

106.    As the Defendants' did not determine Dishman's dispute to be frivolous or irrelevant under § 1681i (a) (3), and did not comply with the Expedited Dispute Resolution requirements of § 1681i (a) (8), then pursuant to § 1681i (a) (2) they were required to notify KeyBridge and Star of Dishman's dispute.

107.    The Defendants' had clear notice that the information it was reporting was false and misleading.

108.    If the Defendants' had conducted a reasonable reinvestigation and notified Star and/or KeyBridge of Dishman's dispute, the information at issue would be reporting accurately.

**Inaccurate and Misleading Information as it Pertains to Star and KeyBridge**

109.   The Defendants independently and jointly, breached their duties as described above and below.

110.   By inaccurately reporting debt information after receiving notice of its errors, the Defendants failed to take appropriate measures as set forth in 15 U.S.C.A. § 1681s-(2)(b)(1)(D) and 1681s-(2)(b)(1)(E).

111.   As a result of Defendants' willful actions and omissions, Dishman is eligible for actual damages, statutory damages, punitive damages and reasonable attorney's fees.

### Injury to Dishman As A Result of the Acts and Omissions Herein

112.   The Defendants acts and omissions have injured Dishman in several ways including but not limited to the diminishment of his FICO and other credit scoring models.

113.   Dishman has also experienced aggravation, frustration, and stress due to the Defendant's failure to correct the errors identified herein.

114.   The Defendants impermissibly deleted or suppressed Dishman's mortgage tradeline, or significant portions of his mortgage tradeline, while reporting discharged debts as open and delinquent, without conducting a reasonable reinvestigation of the disputed information, without notifying Dishman, and without just cause.

115.   The deletion or suppression of Dishman's mortgage tradeline, or significant portions of his mortgage tradeline, and the reporting of discharged debts as open and delinquent, negatively affected and diminished his FICO and other credit scoring model scores by excluding positive payment history, length of credit history, and credit mix information that would, but for the suppression or deletion, be used to calculate his credit score.

116.   Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v.*

*Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017)("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*., 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiff alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate."); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016)("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing.") *Binns v. Ocwen Loan Servicing, LLC*., 2015 WL 5785693, at \*9 (S.D. Ind. Sept. 30, 2015) ("injuries to Plaintiff's credit scores and reputations were considered intangible harms").

117.    Dishman was and remains desirous of improving his FICO and other credit risk modeling scores and refinancing his home.

118.    As such, Dishman took specific actions to address inaccuracies and misleading information in his credit reports.

119.    If the Defendants had conducted a reasonable investigation of Dishman's dispute, the mortgage tradeline would be report as a current and positive account.

120.    If the tradelines at issue were being reported accurately, Dishman's FICO and other credit scoring model scores would be improved.

121.    If Dishman's FICO and other credit model scores were improved to where they should be, he could avail himself to additional credit opportunities or credit opportunities at more favorable rates, and enjoy the cost savings inherent thereto.

## **TRIAL BY JURY**

122.    Dishman is entitled to and hereby requests a trial by jury.

## **CAUSES OF ACTION**
## **COUNTS I & II: VIOLATION OF THE FCRA (EQUIFAX)**

[15 U.S.C.A. § 1681e (b) and 1681i (West)]

123.    Dishman incorporates by reference all preceding paragraphs as though fully stated herein.

124.    Equifax  negligently, or in the alternative willfully, violated 15 U.S.C.A. §1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of Dishman's consumer reports.

125.    Equifax also negligently and willfully violated 15 U.S.C.A. § 1681i in multiple ways including but not limited to failing to conduct a reasonable reinvestigation of Dishman's dispute and failing to appropriately modify inaccurate information in Dishman's file. *See Zahran v. Bank of Am.*, 2015 WL 4397779 (N.D. Ill. July 17, 2015)

126.    As a result of Equifax's violation of 15 U.S.C.A. § 1681e (b) and 15 U.S.C.A. §1681i,  Dishman has suffered actual damage including but not limited to emotional distress, the unjust suppression of his FICO credit score, the resulting payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, and a material risk of future financial harm.

127.    Equifax's acts and omissions are the direct and proximate cause of Dishman's actual damage.

### COUNTS III & IV: VIOLATIONS OF THE FCRA (TRANS UNION)
[15 U.S.C.A. § 1681e (b) and 1681i (West)]

128.    Dishman incorporates by reference all preceding paragraphs as though fully stated herein.

129.    Trans Union willfully, or in the alternative, negligently violated 15 U.S.C.A. §1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of Dishman's consumer reports.

130.     Trans Union also willfully, and/or with malice, or in the alternative, negligently violated 15 U.S.C.A. § 1681i in multiple ways including without limitation by failing to conduct a reasonable reinvestigation of Dishman's dispute and by failing to appropriately delete or modify inaccurate information in Dishman's file. *See* Zahran v. Bank of Am., 2015 WL 4397779 (N.D. Ill. July 17, 2015)

131.     As a result of Trans Union's violation of 15 U.S.C.A. § 1681e (b) and 15 U.S.C.A. §1681i, the continued presence of the inaccurate and/or materially misleading information on Dishman's credit report has caused him actual damage including but not limited to emotional distress, the unjust suppression of his FICO credit score, the payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, and a material risk of future financial harm if the information is not corrected. Those actual damages include the loss of time, payment of increases costs of credit and insurance, and certain out-of-pocket expenses. Therefore, Dishman is entitled to recover actual damages pursuant to 15 U.S.C.A. § 1681n and 1681o (West) and statutory damages pursuant to 15 U.S.C.A. § 1681n.

132.     Dishman is entitled to recover costs and attorney's fees from Trans Union pursuant to 15 U.S.C.A. § 1681n and 1681o.

## COUNT V: VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### [15 U.S.C.A. § 1681s-2(b)]

133.     Dishman incorporates by reference all preceding paragraphs as though fully stated herein.

134.     KeyBridge willfully and/or negligently violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Dishman's dispute from one or more consumer reporting agencies, and/or by failing to review all relevant information provided by the consumer reporting agencies, and/or by failing to appropriately report the results of its

investigations, and/or by failing to appropriately modify, delete, and/or block the inaccurate information.

135.    As a result of KeyBridge's violations of 15 U.S.C.A. § 1681s-2(b), Dishman has suffered actual damage including but not limited to emotional distress, the unjust suppression of his FICO credit score, the payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, and a certain material risk of future financial harm (and continues to pose a material risk of future harm stemming from the decreased perception of Dishman's credit worthiness). Therefore, Dishman is entitled to recover actual damages under 15 U.S.C.A. § 1681n and 1681o.

### COUNT VI: VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### [15 U.S.C.A. § 1681c-1)]

136.    Dishman incorporates by reference all preceding paragraphs as though fully stated herein.

137.    Star willfully and/or negligently violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Dishman's dispute from one or more consumer reporting agencies, and/or by failing to review all relevant information provided by the consumer reporting agencies, and/or by failing to appropriately report the results of its investigations, and/or by failing to appropriately modify, and/or delete the inaccurate information.

138.    As a result of Star's violations of 15 U.S.C.A. § 1681s-2(b), Star has suffered actual damage including but not limited to emotional distress (including aggravation, anxiety, and loss of rest), the unjust suppression of his FICO credit score, the payment of increased costs of credit and insurance, loss of time, loss of credit opportunity, informational injury, certain out of pocket expenses, and a material risk of future financial harm if the information is not corrected. Therefore, Dishman is therefore entitled to recover actual damages under 15 U.S.C.A. § 1681n and

1681o.  The violations also continue to represent a material risk of future harm stemming from the decreased perception of Dishman's credit worthiness.

WHEREFORE, Dishman respectfully requests the following relief:

a.  Actual damages;

b.  Statutory damages;

c.  Punitive damages pursuant to 15 U.S.C.A. § 1681n;

d.  Reasonable attorney's fees and costs pursuant to 15 U.S.C.A. § 1681n and/or 1681o;

e.  That an Order be issued for the Defendants to modify the inaccurate and misleading information being reported; and

f.  Such other and further relief deemed just and proper.

Respectfully submitted,

/s/ Travis W. Cohron
Travis W. Cohron, No. 29562-30
CLARK QUINN MOSES SCOTT & GRAHN LLP
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
tcohron@clarkquinnlaw.com
Counsel for the Plaintiff